E5R0MONS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              11 CR 666 (LAP)

HECTOR XAVIER MONSEGUR,

            Defendant.

------------------------------x

                           New York, N.Y.
                           May 27, 2014
                           11:00 A.M.

Before:

                HON. LORETTA A. PRESKA,

                           District Judge

                   APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JAMES J. PASTORE, JR.
Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
BY:  PEGGY CROSS-GOLDENBERG
    PHILIP WEINSTEIN
Attorneys for Defendant

E5R0MONS

```
 1   (In the ceremonial courtroom)

 2             THE DEPUTY CLERK:  All rise.

 3             THE COURT:  Good morning, ladies and gentlemen.  Won't

 4   you be seated.

 5             United States v. Hector Monsegur.

 6             Government ready?

 7             MR. PASTORE:  We are, your Honor, good morning.

 8             Jim Pastore for the United States.  Joining me at

 9   counsel table is Ilhwan Yum, of the FBI.

10             THE COURT:  Good morning.

11             MR. YUM:  Good morning.

12             THE COURT:  Defense ready?

13             MS. CROSS-GOLDENBERG:  Yes, your Honor, Federal

14   Defenders of New York, by Peggy Cross-Goldenberg and Philip

15   Weinstein.

16             THE COURT:  Ms. Cross-Goldenberg, have you and your

17   client had adequate time to review the presentence report?

18             MS. CROSS-GOLDENBERG:  Yes, your Honor.

19             THE COURT:  Is there any reason it should not be made

20   part of the record?

21             MS. CROSS-GOLDENBERG:  No, your Honor.

22             THE COURT:  Are there any objections to the

23   presentence report?

24             MS. CROSS-GOLDENBERG:  No, your Honor.

25             THE COURT:  Thank you.
```

E5R0MONS

1          With respect to the offense level computation, I

2     accept the findings of the presentence report set forth at

3     paragraphs 4 through 60, which conclude that a total offense

4     level of 35 is appropriate.

5          I do note that in paragraph 49 the citation to the

6     sentencing guidelines should be to Section 2B1.1(b)(1)(L).

7          With respect to the defendant's criminal history, I

8     accept the findings of the presentence report set forth at

9     paragraphs 61 through 66, which conclude that a criminal

10    history category of one is appropriate.

11         Counsel, I have the defense sentencing memorandum

12    dated May 23, 2014.  And I have the government's sentencing

13    memorandum dated May 23, 2014.

14         Are there any additional written materials I should be

15    looking at?

16         MS. CROSS-GOLDENBERG:  No, your Honor.

17         MR. PASTORE:  No, your Honor.

18         THE COURT:  Very well, then.  Ms. Cross-Goldenberg,

19    would you like to speak on behalf of the defendant?

20         MS. CROSS-GOLDENBERG:  Thank you, your Honor.

21         It is our privilege to have the opportunity to speak

22    on behalf of Mr. Monsegur this morning.  We've never been

23    witness to a case like this.  Mr. Monsegur and the assistance

24    that he provided, both, are truly extraordinary.

25         We agree with the recommendation of probation that a

E5R0MONS

1  sentence of time served is appropriate in this case.

2        Mr. Monsegur viewed the internet as a tool that could

3  be used to increase accountability and freedom.

4        During the Arab Spring, for example, when he learned

5  that other countries were cutting off internet access, he did

6  what he could to help restore access and circumvent

7  restrictions so activists could stay connected.

8        He also hoped to use the internet to raise awareness

9  of his fellow citizens, and to increase the accountability of

10  the government and its contractors.

11        Of course, for all of the technical sophistication of

12  their work, he and some of his internet cohorts demonstrated a

13  level of immaturity exhibited by leaving behind some

14  lighthearted calling cards letting system administrators know

15  that they had been able to pass through a security opening in

16  the system.

17        They did some things designed to get laughs, like

18  posting an article on a news website about alleged current

19  whereabouts of a very much alive rapper, Tupac Shakur.

20        And some of Mr. Monsegur's conduct was motivated by

21  desperation.  For example, in his struggle to support his two

22  young cousins who were in his custody, he used account

23  information that he had obtained on line to pay some household

24  bills.  As with many types of cases covered by the United

25  States Sentencing Guidelines, Section 2B1.1, the guidelines

E5R0MONS

1    here are not really a fair representation of the harm caused by

2    Mr. Monsegur's activities.  Yes, the value charged to

3    strangers' accounts and damage that he did, without permission,

4    should be fairly attributed to him.  But much of the dollar

5    amount in the loss calculations in the presentence report, as

6    your Honor just referred to, includes money to fix security

7    holes that Mr. Monsegur did not cause.  He did not break the

8    systems, he revealed vulnerabilities.  These systems needed

9    fixing anyway, regardless of his actions.

10            But, your Honor, I'm not here today to argue about the

11   guidelines.  And that is because on June 7, 2011, Mr. Monsegur

12   made a whole-hearted commitment to making up for his conduct.

13   From the moment agents knocked on his door, he put his family

14   first.  He knew that if he was detained following his arrest,

15   his two young cousins would be taken from his custody and

16   placed with strangers.

17            As the government's papers made clear, the timeliness

18   of Mr. Monsegur's decision to cooperate was critical to the

19   ultimate success of his cooperation.  Before he discussed the

20   pros and the cons and the costs and benefits of cooperation

21   with an attorney, he fully committed to working with the agents

22   who came to his home.  And as the government submission

23   details, the nature and extent of Mr. Monsegur's cooperation

24   was great.

25            He reviewed footprints of past computer intrusions and

E5R0MONS

```
1    explained the steps that had been taken to agents.  He reviewed

2    chat logs, verifying his participation and placing different

3    conversations in context.  He resumed his on-line activities

4    and passed along new information that he obtained.

5          He also confessed to conduct that the government was

6    unaware of and, likely, never would have been able to prove.

7    This of course dramatically increased his sentencing exposure.

8          Because of his on-line name recognition, people wanted

9    to work with him.  When people around the world identified

10   vulnerabilities, they passed them along to Mr. Monsegur,

11   whether because they were bragging about their discoveries or

12   because they wanted his stamp of approval.

13         Some of these vulnerabilities were simply open doors

14   in computer systems that people intended to walk through for

15   laughs.  Because of Mr. Monsegur's work, these doors were able

16   to be closed before anyone could walk through them.

17         But others were vulnerabilities that could have been,

18   and in some instances were intended to be exploited with

19   disastrous consequences.  For example, individuals revealed to

20   Mr. Monsegur that they had discovered a vulnerability in the

21   water supply system of a major U.S. city that would have

22   allowed for the disruption and contamination of that system.

23         Another example is the vulnerability that individuals

24   revealed that would have permitted a takeover in the supply and

25   distribution chain of a foreign energy supply company.  The
```

E5R0MONS

1   disastrous consequences of these takeovers were avoided due to

2   Mr. Monsegur's extraordinary assistance.

3          Indeed, as the government detailed in its submission,

4   Mr. Monsegur helped avoid over 300 intrusions.  In doing so he

5   strengthened the security of agencies such as the United States

6   Congress, the United States Courts, other government agencies,

7   as well as private companies.

8          It is impossible to quantify the savings that resulted

9   from his actions, but the government estimates that he helped

10  save many millions, if not billions of dollars.

11         Mr. Monsegur did all of this, your Honor, at great

12  cost and risk to him and his family.  For months, he worked

13  around the clock.  Many of the people he interacted with on the

14  internet were overseas.  And the time differences required Mr.

15  Monsegur to be on line at all hours of the night.

16         The government tracked everything he typed with a key

17  logging program.  There was a camera installed in his house to

18  monitor all of his activities.  For 9 months, he kept up this

19  around-the-clock pace.  He gave everything that he had.  And

20  then on March 6, 2012, the world became a much more dangerous

21  place for him and his family.  The government used the

22  information he had provided to arrest LulzSec co-conspirators,

23  as well as others, and then decided to publicize his

24  cooperation to capitalize on the deterrent effect of announcing

25  his cooperation.

E5R0MONS

```
1            Law enforcement decided that the deterrent value of
2     announcing his cooperation was greater than the value of his
3     continued proactive cooperation.  As the Court knows, paperwork
4     regarding cooperation usually is unsealed only on the eave of a
5     trial at which testimony is required, or on the eave of the
6     cooperator's own sentencing.  And in many cases, because most
7     cases are resolved with a guilty plea the cooperation is never
8     publicly revealed and some sentencing proceedings and even some
9     complete dockets remain under seal.  This could have been such
10    a case, because all of Mr. Monsegur's co-conspirators, all of
11    the co-conspirators, pled guilty without a trial.  But the
12    government sought the added deterrent of making his cooperation
13    public.  It was not just the fact that his cooperation, it was
14    the fact his cooperation was revealed.  Law enforcement
15    revealed details of his cooperation and his arrest that were
16    known only to Mr. Monsegur and the agents.
17            The morning after his cooperation was revealed, his
18    face and his story were plastered all over the internet.  It
19    was not even safe for him to go home.  And Mr. Monsegur and
20    some of his family had to be relocated.  People in his
21    neighborhood may not have known the details of this case.
22    Indeed most of those who were arrested were arrested overseas.
23    But many had a strong objection to the concept of cooperation
24    with law enforcement.
25            While the details of his work may not have trickled
```

E5R0MONS

1    down to the streets, the fact that he was a snitch certainly

2    did.  This, alone, exposed Mr. Monsegur and his family to

3    danger.  They were threatened in retaliation for his

4    cooperation.  His brother was physically assaulted.

5          The press was relentless.  For example, a reporter

6    followed his young cousins into their elementary school in

7    clear violation of the school security policy to question them

8    about Mr. Monsegur and the case.  And it was not just that the

9    publicity was unwelcome or embarrassing, it was really

10   dangerous.  One of Mr. Monsegur's former employers received a

11   voicemail message threatening Mr. Monsegur.  A magazine cover

12   story detailing his family history and his cooperation was

13   published.  And while Mr. Monsegur was at the MCC, that story

14   made the rounds within the institution.  This exposed him to

15   serious danger.

16         The publicity also threatened the girls.  The morning

17   after Mr. Monsegur's cooperation was publicly revealed, he

18   received a phone call.  And the agency that oversaw the girls

19   foster care placement threatened to take them away from Mr.

20   Monsegur and place them with strangers.  It is impossible to

21   put into words the terror, the fear that ran through the entire

22   family as we all traveled together to the agency that morning

23   to plead that the girls be permitted to remain with family.

24         Luckily, after hours of closed-door meetings, the

25   agency agreed to accelerate the return of the girls to their

E5R0MONS

mother's custody.  As the Court knows, Mr. Monsegur was

detained at the MCC from May through December of 2012.  Despite

the attention and the danger generated by his cooperation, Mr.

Monsegur attempted to make the most of his time at the MCC.  He

read.  He planned.  And he taught.  He used his skills to help

other incarcerated individuals.  He designed a course on

computing essentials.  He knew that the job prospects for

formerly-incarcerated individuals were bleak, especially when

they didn't have up-to-date computer skills.  So he designed a

course to teach the very basics, as well as some simple system

troubleshooting, and some simple software use.

       Since his release in December of 2012, he's continued

to focus on his family.  He cares for sick family members and

remains an important part of the girls' lives.  But he despairs

when he thinks of what he put his family through.  When he

thinks about their personal information being distributed on

line, about the dangers that he placed them in, they and he

will live with the consequences of his actions forever.

       Through the great personal cost to Mr. Monsegur,

though, came tremendous benefit to the government.  By any

measure, your Honor, whether it is dollars, time, energy, level

of information, crisis averted, by any measure, Mr. Monsegur

has more than made up for his actions.

       By any measure of the factors contained in Title 18

United States Code 3553(a), no further period of incarceration

E5R0MONS

1    or supervision is necessary.  In light of the nature and

2    circumstances of his offense, his own personal history and

3    characteristics, the severe punishment he already has faced,

4    much of it not contemplated by the guidelines, and in light of

5    his full compliance with the conditions of his release over the

6    past 18 months, any further term of incarceration or

7    supervision would be greater than necessary to effect the

8    statutory sentencing objectives.

9           Because of his cooperation, there is no truly

10   similarly-situated defendant to whom his sentence can be

11   compared.  But a sentence of time served would not create any

12   unwarranted sentencing disparities.  His LulzSec

13   co-conspirators received sentences ranging from probation to

14   30 months incarceration.  This Court provided over another

15   affiliated case that resulted in a higher sentence, but the

16   Court is aware that there were distinctions between the cases

17   that warranted the disparity in sentences.

18          By any of the measures contained in the United States

19   Sentencing Guidelines Section 5K1.1, a sentence of time served

20   is the just and appropriate sentence.  Mr. Monsegur's

21   cooperation was timely.  It was significant.  It was truthful.

22   It was extensive.  And it was done at great risk of retaliation

23   and danger to him and his family.

24          In the presentence report, probation recognizes his

25   valuable and significant assistance in recommending a sentence

E5R0MONS

1   of time served.

2          Your Honor, Mr. Monsegur's cooperation was

3   extraordinary in every way.  For all of these reasons, we

4   respectfully request that the Court impose a sentence of time

5   served.

6          Thank you, your Honor.

7          THE COURT:  Thank you.

8          I guess I should ask, before I ask Mr. Monsegur to

9   speak, if the government now moves.

10         MR. PASTORE:  Yes, your Honor.  Most of what I have to

11  say is in our submission.  I do want to highlight a few points.

12         First, I agree with defense counsel.  It is difficult

13  to fully quantify Mr. Monsegur's cooperation, whether solely by

14  the number of prosecutions, or by the number of hacks that he

15  helped prevent.

16         At the time of his arrest, he was uniquely situated,

17  really, to provided singular insight into anonymous LulzSec and

18  other significant cyber criminals.

19         Through Monsegur's cooperation, law enforcement gained

20  a better understanding of how those hacker collectives

21  operated.  Through Mr. Monsegur's cooperation, law enforcement,

22  both domestically and abroad, was able to unmask and prosecute

23  a number of significant cyber criminals.  And through Mr.

24  Monsegur's cooperation, we were able to thwart all together or

25  mitigate harm from hundreds of hacks.

E5R0MONS

1           In terms of Mr. Monsegur's truthfulness, he provided

2      information to the government about a number of activities that

3      the government was not aware of and not investigating.  And

4      that did substantially increase his guidelines exposure, as

5      opposed to a situation where he chose simply to plead guilty

6      and not cooperate.

7           And, finally, I do want to emphasize the personal risk

8      that Mr. Monsegur took, not only upon himself but on his

9      family.  Defense counsel has touched on some of those

10     incidents.  But it is difficult to capture the around-the-clock

11     operation that this really was.

12          Mr. Monsegur would chat on line with individuals at

13     the direction of law enforcement.  And then he would meet with

14     law enforcement afterwards to do a full debrief on exactly who

15     each of those individuals were, what he knew about them, and

16     how they fit into the overall picture of LulzSec and the other

17     cyber crimes that he provided information about.

18          Through his cooperation, we averted untold millions of

19     dollars in loss to victims.  And we also averted potential

20     really catastrophic problems with critical infrastructure.  So

21     for that reason, the government now moves, pursuant to Section

22     5K1.1 of the guidelines for a downward departure and also

23     pursuant to Title 18 United States Code Section 3553(e) for

24     relief from the mandatory minimum.

25          THE COURT:  The government's motion is granted.

E5R0MONS

1        As the government sets out in its submission, Mr.

2   Monsegur's cooperation was truly extraordinary.

3        As to the significance and usefulness of his

4   assistance, the government characterizes his cooperation as

5   extraordinarily valuable and productive.

6        The government notes that Mr. Monsegur provided,

7   "unprecedented access to LulzSec."  As counsel pointed out, Mr.

8   Monsegur was singularly able to provide sophisticated and

9   complex assistance to the government.

10        His assistance allowed the government to pierce the

11   secrecy surrounding the group, to identify and locate its core

12   members and, successfully, to prosecute them.

13        As pointed out by counsel, Mr. Monsegur's assistance

14   allowed the government to understand better the hacker

15   cooperatives, to understand and analyze the footprints of prior

16   computer intrusions, and as Ms. Cross-Goldenberg pointed out,

17   to reveal to the government and, thus, close the doors to

18   various, numerous, in fact, vulnerabilities that had been

19   identified by the hacking community.

20        As Ms. Cross-Goldenberg pointed out, this averted

21   compromise of the water supply of a major United States city,

22   the takeover of a supply and distribution channel of a foreign

23   energy company.

24        As the government and Ms. Cross-Goldenberg also point

25   out, Mr. Monsegur's cooperation was truly extraordinary because

E5R0MONS

1    of the around-the-clock nature of it at the outset.  As pointed

2    out in the papers, the organization apparently had protocols in

3    place that would require the destruction of certain information

4    if members were off line for a certain period of time.

5            And the fact that Mr. Monsegur immediately chose to

6    cooperate and went back on line, prevented the destruction of

7    all of that material and allowed the extraordinary cooperation

8    that the government details in its papers.

9            So in this instance, the immediacy of Mr. Monsegur's

10   cooperation and its around-the-clock nature was particularly

11   helpful to the government.  As to the truthfulness,

12   completeness, and reliability of Mr. Monsegur's cooperation,

13   the government notes that he presented as, "fully candid and

14   admitted not only to crimes about which the government had

15   gathered evidence, but also crimes about which the government

16   had not previously gathered evidence."

17           As noted by counsel, those admissions dramatically

18   increased Mr. Monsegur's guidelines level.  The government also

19   evaluates Mr. Monsegur's cooperation as consistently reliable

20   and complete, corroborated by documents and electronic files,

21   as well as statements from other witnesses.

22           The government also notes that Mr. Monsegur has been

23   cooperating with law enforcement for approximately three years,

24   and notes that he provided substantial historical cooperation

25   as well as substantial proactive cooperation, and was prepared

E5R0MONS

1    to testify as needed.

2          The government also notes, however, that with the

3    exception of one individual, Mr. Monsegur's cooperation, "no

4    doubt played a significant role in securing several of [the]

5    guilty pleas," of related individuals.

6          Finally, as to the risk and danger associated with Mr.

7    Monsegur's cooperation, I must say this is also an

8    extraordinary case for that reason.  As detailed by Ms.

9    Cross-Goldenberg, it is quite unusual for the government to

10   publicize cooperation and particularly at such an early stage.

11   As Ms. Cross-Goldenberg pointed out, usually the cooperation is

12   only disclosed prior to the trial of the co-defendant, or at

13   the sentencing of the actual cooperating defendant, and

14   sometimes not even then.  But as contained in Ms.

15   Cross-Goldenberg's papers, the government issued a lengthy

16   press release at the time of the arrest of a number of the

17   related defendants, trumpeting Mr. Monsegur's cooperation.  He

18   has quite graphically discussed the fall-out from that

19   publicity.

20         But I note, first, that it is very, very unusual.

21   Secondly, I don't think there is any question that Mr. Monsegur

22   and his family were subject to threats, assaults, and all

23   manner of danger, to the extent that Mr. Monsegur and members

24   of his family have been relocated.

25         Ms. Cross-Goldenberg has also related the danger of

E5R0MONS

1    the young girl cousins being removed to family protective

2    services, and the extraordinary efforts she and her team went

3    through to keep the girls with a family member.  So I certainly

4    take that into account.

5            And for all of these reasons, find that Mr. Monsegur's

6    entitled to a downward departure.

7            Ms. Cross-Goldenberg, did you wish to add anything

8    more before I ask Mr. Monsegur if he wishes to speak?

9            MS. CROSS-GOLDENBERG:  No, your Honor.

10           THE COURT:  Thank you.

11           Sir, do you wish to speak?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  Would you do so now, please?

14           Stand up, speak out.  The mic will pick you up.

15           THE DEFENDANT:  Good morning, your Honor.

16           THE COURT:  Good morning, sir.

17           THE DEFENDANT:  The last three years, I have gone

18   through a lot of changes, learned a lot of lessons.  I came a

19   long way -- yeah, I came a long way.  I have had to do a lot of

20   thinking and soul searching and evolving, psychologically,

21   emotionally.  One of the things I realized is that I hurt my

22   family the most, my friends, and victims in the case.  And

23   I have gained such regret for even putting anyone through this.

24   I assure you I will not be in this courtroom ever again.  I --

25   I'm not the same person you saw three years ago.  I'm ready to

E5R0MONS

1    move on.

2                   That's it, thank you.

3                   THE COURT:  Yes, sir, thank you.

4                   Does the government wish to be heard?

5                   MR. PASTORE:  No, your Honor.  Nothing further.

6                   THE COURT:  Very well, then.

7                   If there are any victims in the courtroom who would

8    like to be heard, would you come forward, now.

9                   Seeing none.

10                  Thank you, ladies and gentlemen.

11                  Counsel, as you have heard, I have calculated the

12   guidelines and certainly consider them in this sentencing.  And

13   as Ms. Cross-Goldenberg pointed out, the crimes which Mr.

14   Monsegur confessed to, of which the government previously had

15   no knowledge, contributed significantly to the increase in his

16   guidelines sentencing level.  But, nevertheless, I take that

17   into account and find that the guidelines accurately describe

18   the nature and circumstances of the offense.

19                  In so doing, though, I do observe that the amount of

20   the loss and damage is in great part attributable to the

21   vulnerabilities that were present in the systems which were

22   hacked.  That doesn't excuse what was done, but I do make that

23   observation.

24                  With respect to the history and characteristics of the

25   defendant, of course Mr. Monsegur is in criminal history

E5R0MONS

1   category I, the lowest category.  But, as we've heard here

2   today from counsel, that does not begin to describe the man who

3   is being sentenced.

4        I do note, at the outset, Mr. Monsegur's extreme care

5   for his young cousins.  And this was throughout the time when

6   their mother was absent, a time prior to his arrest, and

7   described great devotion of Mr. Monsegur.  That he was able to

8   continue that high level of devotion at a time when he was

9   under so much personal stress, is a great tribute to him.  But

10  the major driving force in this sentencing is of course the

11  extraordinary cooperation which Mr. Monsegur provided.

12       As I have mentioned, the timeliness of his decision to

13  cooperate was crucial in permitting the cooperation to thwart

14  attacks that might take place and in permitting the government

15  to identify and locate other co-conspirators.  That he

16  continued that cooperation for extraordinary time periods.  And

17  of course I don't rely merely on the three years, but on the

18  virtual around-the-clock cooperation where Mr. Monsegur was

19  sitting with agents, around the clock, to talk with hackers

20  from around the world.  It was truly extraordinary.  We don't

21  often hear of this.

22       Aside from the timeliness and the extent of Mr.

23  Monsegur's cooperation, the fact that he was able to lend his

24  skills to the government in an effort to identify perpetrators

25  and so very importantly to thwart attacks on American cities,

E5R0MONS

and energy distribution, various arms of the United States

government, is truly extraordinary.  So, to me, that personal

characteristic of turning on a dime and doing good and not evil

is the most important factor in this sentencing.

As among the paragraph two factors, the most important

factors, in my view, are public deterrence and unwarranted

sentencing disparities.

I certainly take to heart the thought that a lengthy

sentence of incarceration would deter others.  However, in this

instance, in light of Mr. Monsegur's cooperation, which is

truly extraordinary, a lengthy sentence is much more than what

is required to fulfill the sentencing guidelines.

I do note that as set out in counsel's papers, other

perpetrators in this scheme have received substantial

sentences.

With respect to unwarranted sentencing disparities, in

light of Mr. Monsegur's personal characteristics, particularly

his extraordinary cooperation, any perceived sentencing

disparity is, in my view, well warranted.

Taking all of those factors into account, then,

counsel, it is my intention to sentence Mr. Monsegur to time

served, followed by a period of one year of supervised release

on each count, to run concurrently.

As I understand it, the Government is going to provide

additional information on restitution; is that right?

E5R0MONS

 1              MR. PASTORE:  That's correct, your Honor.

 2              THE COURT:  Within the 90 days.

 3              MR. PASTORE:  Yes, your Honor.

 4              And as to forfeiture, we have not located any assets

 5    of the defendant, so we're not seeking it at this time.

 6              THE COURT:  Very well, then.

 7              And, finally, it is my intention to impose the

 8    mandator $1200 special assessment.

 9              Counsel, is there any reason such a sentence should

10    not be imposed?

11              MS. CROSS-GOLDENBERG:  No, your Honor.

12              MR. PASTORE:  No, your Honor.

13              THE COURT:  Very well, then.

14              Mr. Monsegur, you're sentenced, sir, to a period of

15    time served, followed by a period of one year of supervised

16    release.

17              During that time, you have to comply with all of the

18    standard terms and conditions of supervised release.  Among

19    them are that you not commit another federal, state, or local

20    crime; you not illegally possess a controlled substance; and

21    you not possess a firearm or other destructive device.

22              Counsel, I'm sorry, I neglected to say that it's my

23    intention to impose the recommended special conditions of

24    search, and consent to a computer monitoring program.

25              Is there any objection to that?

E5R0MONS

1          MS. CROSS-GOLDENBERG:  No, your Honor.

2          MR. PASTORE:  No, your Honor.

3          THE COURT:  Very well, then.

4          Sir, during the period of supervised release, you will

5    submit your person, residence, place of business, vehicle, or

6    other premises under your control to a search on the ground

7    that the probation officer has reasonable belief that

8    contraband or evidence of a violation of the terms and

9    conditions of your release may be found there.

10         The search must be conducted at a reasonable time and

11   in a reasonable manner.  Failure to submit to such a search

12   might be grounds for revoking your supervised release.

13         It will be your obligation to inform other residents

14   of the premises that that premises may be subject to a search,

15   under this condition.

16         As I mentioned, counsel will provide information

17   relating to restitution within 90 days.  But at this point, I

18   must impose and do impose the $1200 special assessment.  And

19   that should be paid promptly.

20         It's my duty to inform you, sir, that unless you have

21   waived it, you have the right to appeal this sentence.  And you

22   might have the right to appeal in forma pauperis, which means

23   as a poor person, with the waiver of certain fees and expenses.

24         Counsel, is there anything further?

25         MR. PASTORE:  Yes, your Honor.  At this time, the

E5R0MONS

1    government moves to dismiss the underlying indictments and open

2    counts.  And in particular, we move to dismiss the indictments

3    in the related cases 11 CR 693, 694, 695, and 696.

4                THE COURT:  So ordered.

5                Anything else, Ms. Cross-Goldenberg?

6                MS. CROSS-GOLDENBERG:  It may not need to be addressed

7    now until we finalize the restitution, but we would request

8    that the restitution be ordered to be paid as a percentage of

9    Mr. Monsegur's monthly income.

10               THE COURT:  All right.

11               MS. CROSS-GOLDENBERG:  We would request 10 percent.  I

12   don't know if we need to do that today or if we can handle

13   that --

14               THE COURT:  Why don't do you it in your letter with

15   respect to restitution.

16               MS. CROSS-GOLDENBERG:  Thank you, your Honor.

17               THE COURT:  Mr. Monsegur, as we have heard -- that's

18   all right, that doesn't hurt, he can stand.  That was a very

19   good thing to do.

20               MS. CROSS-GOLDENBERG:  Yes.

21               THE COURT:  I take it as a sign of great respect.

22   Thank you.

23               As we have heard, the things you did before were not

24   so good.  I do appreciate you're saying, and heartily believe,

25   that we will not see you in this courtroom ever again.  You

E5R0MONS

1   obviously have great skill.  To deploy that skill for good,

2   would be a very good thing.  You have done as much as any human

3   being can do in terms of helping the government to make up for

4   your past wrongs and to avert other damage to probably millions

5   of people.

6            So I salute you for that.  I salute you for your

7   teaching at the MCC.  You seem to be on the right path.  And I

8   look forward reading about your deploying your great skills for

9   good.

10            THE DEFENDANT:  Thank you, your Honor.

11            THE COURT:  Yes, sir.

12            Counsel, thank you for your assistance.

13            Good morning.

14            MS. CROSS-GOLDENBERG:  Thank you, your Honor.

15            MR. PASTORE:  Thank you your Honor.

16            (Adjourned)

17

18

19

20

21

22

23

24

25